IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In Re:
JACKIE LLOYD HOLDER, JR.,

Debtor.

Case No. 05-83014-G3-7
Adversary Proceeding No. 06-08003-G3

---

JACKIE LLOYD HOLDER, JR.,

Appellant,

v.

TEXAS DEPARTMENT OF PUBLIC SAFETY and THOMAS A. DAVIS, JR.,

Appellees.

CIVIL ACTION NO. H-06-4061

**OPINION AND ORDER**

Pending before the court is an appeal by Debtor Jackie Lloyd Holder, Jr. ("Holder") from an adverse summary judgment issued against him by the Bankruptcy Court in the Southern District of Texas ("Bankruptcy Court") in his adversary proceeding against Appellees Texas Department of Public Safety and Thomas A. Davis, Jr. (collectively "DPS"). For the reasons explained below, the court AFFIRMS the Bankruptcy Court's decision.

I. Background & Relevant Facts

(A) The Driver Responsibility Program

Texas enacted the driver responsibility program in 2003. *See Ex parte Drake*, 212 S.W.3d 822, 823 (Tex. App.–Austin 2006, pet. ref'd). Under this program, the state is charged with imposing and collecting surcharges from individuals who are found guilty of certain traffic violations. *See* Tex. Transp. Code Ann. § 708.101 *et seq*. (Vernon Supp. 2006). The state also enforces measures to ensure that uninsured motorists who have caused others losses as a result of motor vehicle accidents are financially accountable for those damages, by posting a bond or otherwise demonstrating that they will address the liability. Failure to pay these surcharges results in the suspension of one's driver's license. *See id.* § 708.152.

Surcharges collected by the state of Texas are payable to DPS. These monies are remitted on behalf of DPS to the Comptroller of Public Accounts ("Comptroller") on the first Monday of each month. *See* Tex. Transp. Code Ann. § 708.156 (Vernon Supp. 2006); Tex. Health & Safety Code Ann. § 780.002(a) (Vernon Supp. 2006). The Comptroller deposits 49.5% of the surcharge monies received into the general revenue fund. Tex. Health & Safety Code Ann. § 780.002(b) (Vernon Supp. 2006). The Comptroller deposits another 49.5% of these monies into a "Trauma Fund," the revenues from which are used to "fund designated trauma facilities, county and regional emergency medical services, and trauma care systems." *See id.* §§ 780.002(b), 780.003, and 780.004. The remaining 1% of the monies offset DPS's expenses incurred in administering the program. *Id.* § 780.002(b).

Under certain conditions, a portion of the 49.5% of the surcharge monies designated for the general revenue fund are deposited in the "Texas Mobility Fund," an account maintained in the state treasury and used to fund construction and maintenance of state highways.[1] *See id.* 780.002(c). When traffic fines collected by DPS are added to the 49.5% of surcharges collected in a given year, any amount in excess of $250 million is deposited in the Texas Mobility Fund. *Id.* Historically, however, the collection of surcharges has never exceeded $250 million per year. (Campbell Aff. attached to Defs.' Mot. Summ. J., R. vol. 4 Doc. 16).

(B) The Debtor

---

[1] Article 2, section 49-k of the Texas Constitution provides that

> (b) The Texas Mobility Fund is created in the DPS treasury and shall be administered by the commission as a revolving fund to provide a method of financing the construction, reconstruction, acquisition, and expansion of DPS highways, including costs of any necessary design and costs of acquisition of rights-of-way, as determined by the commission in accordance with standards and procedures established by law.
>
> (c) Money in the fund may also be used to provide participation by the DPS in the payment of a portion of the costs of constructing and providing publically owned toll roads and other public transportation projects in accordance with the procedures, standards, and limitations established by law.

Before and during the pendency of his bankruptcy, Holder was cited numerous times for driving while intoxicated, driving without liability insurance, and driving without a valid driver's license. (*See* Zgabay Aff. 3-4, R. vol. 7 Doc. 20).[2] These citations resulted in virtually continuous suspension of Holder's license, as well as a debt of almost $6000 in surcharges owed to the DPS. (*Id.* at 1-2 and Ex. 1 attached thereto; Am. Stipulated Facts, R. vol. 9 Doc. 26).

Holder filed his voluntary chapter 13 bankruptcy on October 13, 2005, and he converted his case to chapter 7 shortly thereafter. (*See* Bk. Docs. 1 & 7, R. vol. 11 Doc. 39). Holder scheduled as creditors, *inter alia*, (1) holders of a judgment for an automobile accident and (2) DPS for the various criminal and traffic violation conviction surcharges. (Schedules and Summary, R. vol. 12 Doc. 44). In response, DPS inadvertently sent Holder automated correspondence related to his unpaid surcharges. (Zgabay Aff. 2-3, R. vol. 7 Doc. 20).

Holder filed an adversary proceeding, from which this appeal arises, seeking a declaration by the Bankruptcy Court that the surcharges (including interest, collection costs, and fees) levied against him for traffic and criminal convictions were dischargeable. (*See* Bk. Mem. & Op. 2, R. vol. 11 Doc. 33). Holder also alleged that DPS violated the automatic stay by attempting to collect these surcharges. (*Id.*). Further, Holder claimed that DPS was withholding his driver's license because of his failure to pay the surcharges in violation of the automatic stay and that he was entitled to have his license reinstated as injunctive relief. (*Id.* at 2-3).

The parties did not dispute the relevant facts presented to the Bankruptcy Court. (*See* Joint Motion to Extend Pretrial Deadlines and Reset Status Conference ¶ 4, R. vol. 3 Doc. 10) (jointly stating that "[t]he parties believe that this case may be resolved by competing motions for summary judgment, as there do no appear to be contested issues of material fact").[3] Holder moved for summary judgment on five grounds: (1) that DPS violated the automatic stay by refusing to

---

[2] The designated record of appeal is located at Docket Entry No. 5. For the purposes of this opinion, "Doc. [#]" refers to the record document number contained in the designated record of appeal.

[3] Indeed, Holder's motion for summary judgment in the bankruptcy proceeding began by reiterating that Holder believed "there are no material facts in dispute." (*See* Pl.'s Mot. Summ. J. 1, R. vol. 4 Doc. 17).

reinstate his driver's license for Holder's failure to pay past due surcharges as well his failure to post security related to his traffic accident; (2) that the surcharges were dischargeable; (3) that the surcharges should all be treated as dischargeable pre-petition debt; (4) that he claim for security related to traffic accident liability was dischargeable; and (5) that Holder was entitled to injunctive relief resulting in the reinstatement of his driver's license. (*See* Holder's Mot. Summ. J. 3-9, R. vol. 4 Doc. 17).

DPS filed an objection to Holder's motion for summary judgment arguing, *inter alia*, that injunctive relief in the form of reinstating Holder's driver's license would be inappropriate because his license had been suspended for reasons unrelated to nonpayment of amounts owed to DPS. (Defs.' Obj. 1-2, R. vol. 7 Doc. 21). DPS further objected "[t]here is no genuine issue of material fact that the Defendants are *not*, contrary to Debtor's allegations, violating the automatic stay by 'withholding reinstatement'" of Holder's license. (*Id.* at 3) (emphasis in original). DPS also argued that all but 1% of the surcharges, earmarked for administrative costs, and future surcharges were nondischargeable governmental fines or penalties. (*Id.* at 4-6). DPS also filed a competing motion for partial summary judgment on the dischargeability of its surcharge claim. (Defs.' Mot. Summ. J., R. vol. 4 Doc. 16). DPS did not move for summary judgment on the issue of whether DPS had violated the automatic stay by sending automatic notices regarding the surcharges.

The Bankruptcy Court listened to brief oral arguments on September 26, 2006, and took the motions under advisement. Thereafter, the Bankruptcy Court entered judgment in favor of DPS and denying all claims in Holder's complaint. In this regard, the Bankruptcy Court issued a Memorandum Opinion (hereafter "Bk. Mem. Op.") in support of that judgment. (*See* R. vol. 10 Doc. 33). Holder timely filed the current appeal.

II. <u>Bankruptcy Review</u>

This court exercises jurisdiction over the pending appeal from the Bankruptcy Court's pursuant to 28 U.S.C. §158(a). This appeal from a bankruptcy court to a district court is

"taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts[.]" 28 U.S.C. §158(c)(2). Thus, this court applies the same standard of review that a circuit court would employ. *In re Killebrew*, 888 F.2d 1516, 1519 (5th Cir. 1989). Specifically, the court reviews findings of fact by the bankruptcy court under the clearly erroneous standard and reviews issues of law and mixed questions of law and fact *de novo*. *Universal Seismic Assocs. Inc. v. Harris County (In re Universal Seismic Assocs., Inc.)*, 288 F.3d 205, 207 (5th Cir. 2002). Moreover, the court may affirm if there are any grounds in the record to support the judgment, even if those grounds were not relied upon by the courts below." *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 245 (5th Cir. 2006) (citing *Bustamante v. Cueva (In re Cueva)*, 371 F.3d 232, 236 (5th Cir.2004) (internal quotations omitted)).

## III. Analysis

Holder contends (1) that the Bankruptcy Court erred in granting summary judgment against him *sua sponte* regarding violations of the automatic stay without giving him the requisite notice; (2) that the Bankruptcy Court erred in denying his motion for summary judgment on this issue; (3) that the Bankruptcy Court erred in declaring the $5960 in surcharge fees to be nondischargeable; and (4) that the Bankruptcy Court erred in not providing him injunctive relief in the form of reinstatement of his driver's license. Addressing each issue in turn, the court concludes that none of Holder's issue are meritorious and, therefore, affirms the decision of the Bankruptcy Court in all respects.

### 1. Whether the Bankruptcy Court erred in granting partial summary judgment *sua sponte* on the issue of whether DPS violated the automatic stay.

Courts are generally empowered to grant summary judgment against a party *sua sponte* as long as the losing party was on notice to come forward with all his evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all her evidence."); *see also HS Res., Inc.. V. Wingate*, 327 F.3d 432, 441

(5th Cir. 2003). Lack of notice of a court's intent to consider summary judgment may, however, constitute reversible error. *See NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 964 (5th Cir. 1991) (reversing and remanding the district court's summary judgment ruling because such a ruling is proper only upon adequate notice to the adverse party). Any "reasonable doubts" about whether a non-movant received notice must be resolved in favor of that party. *HS Res.*, 327 F.3d at 441 (citing *NL Indus., Inc.*, 940 F.2d at 965).

Here, there can be no reasonable doubt that Holder was on notice that he should submit all evidence required to support his position that the DPS violated the automatic stay. He moved for summary judgment on this very issue. Moreover, Holder not only stipulated to the majority of the facts but also indicated numerous times that no genuine issues of material fact existed. He never challenged or controverted DPS's summary judgment evidence, which included affidavits and other documentary evidence. Although the Fifth Circuit typically requires 10 days' notice to a losing party prior to entering summary judgment *sua sponte*, *see* Fed. R. Civ. P. 56(c); *Balogun v. I.N.S.*, 9 F.3d 347, 352 (5th Cir. 1993), it was harmless error for the Bankruptcy Court not to provide formal notice to Holder because he had adequate notice that summary judgment against him on the issue of the automatic stay was likely. Having moved for summary judgment and having been served with DPS's objections to that motion, Holder had sufficient time and notice to direct the Bankruptcy Court to other factual or legal theories on which he might prevail. He choose not to do so.

Additionally, Holder's reliance on the general proposition that a court may not grant summary judgment *sua sponte* on grounds not raised by the moving party, *see Baker v. Metro Life Ins. Co.*, 364 F.3d 624, 632 (5th Cir. 2004) (quoting *John Deere Co. v. Am. Nat'l Bank*, 809 F.2d 1190, 1192 (5th Cir. 1987)), is unavailing in this context. The Bankruptcy Court did not grant summary judgment on grounds not asserted by DPS. DPS, in its objections to Holder's motion for summary judgment (R. vol. 7 Doc. 21), asserted the very grounds on which the Bankruptcy Court relied in entering judgment against Holder.

For these reasons, the court concludes that the Bankruptcy Court did not commit reversible error when it ruled *sua sponte* in favor of the DPS on the issue of the DPS's violation of the automatic stay.

2. Whether the Bankruptcy Court correctly found that, as a matter of law, DPS had not willfully violated the automatic stay.

Under Bankruptcy Code section 362(h),[4] "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Requesting damages under this provision, Holder argued to the Bankruptcy Court that DPS was willfully violating the automatic stay (1) by withholding the reinstatement of his driver's license; (2) by attempting to collect the surcharges post-petition; and (3) by requiring that Holder post security. The Bankruptcy Court found against Holder on all the alleged violations and denied his request for damages, costs, and attorneys' fees. (Bk. Mem. Op 11, R. vol. 10 Doc. 33). The court agrees that Holder has failed to establish any willful violations of the automatic stay by DPS.

First, as the Bankruptcy Court correctly pointed out, Holder's driver's license was suspended for reasons completely unrelated to his failure to pay pre- or post-petition surcharges to the DPS. As the undisputed facts demonstrated, Holder's driver's license had been suspended almost continuously from October 2003 to October 2005 because of his convictions for driving while intoxicated, driving without liability insurance, driving with an invalid license, and driving with suspended license. His most recent suspension, suspending his license until March 2007, was the result of a judgment in a criminal proceeding. Holder misstates the facts when he claims that DPS is withholding the reinstatement of his license due to the non-payment of surcharges and the failure to post security for an accident. Even if Holder owed no surcharges at all, he would still not be entitled to the reinstatement of his license.

[4] The instant case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act, Pub.L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA") (effective Oct. 17, 2005). The following citations are to the pre-amendment statute unless otherwise indicated.

Second, the Bankruptcy Court did not clearly err in its findings of fact that the two post-petition communications with Holder were the result of an automated process by which DPS inadvertently sent computer-generated notices to Holder regarding the surcharges. DPS offered uncontroverted evidence concerning its automated billing process. Moreover, Holder has not clearly disputed the fact that the content of these communications was "mostly informational as to the requirements to have a driver's license reinstated." (Bk. Mem. Op. 10, R. vol. 10 Doc. 33). Computer-generated responses containing general information on how to reinstate a driver's license do not demonstrate a willful disregard of the automatic stay, and Holder offers no competent evidence or convincing argument to the contrary.

Third, as noted by the Bankruptcy Court, the alleged violation of the automatic stay relating to the security was rendered moot by DPS withdrawing its request that Holder post such security. (See Bk. Mem. & Op. 11, R. vol. 10 Doc. 33).

Therefore, the Bankruptcy Court correctly concluded that no genuine issues of material fact existed and that summary judgment in DPS's favor on the automatic stay issue was appropriate.

3. Whether Holder's traffic law violation surcharges were nondischargeable as "fine[s], penalt[ies], or forfeiture[s] payable to and for the benefit of a government unit and [are] not compensation for actual pecuniary loss."

Section 523(a)(7) of the Bankruptcy Code provides that a claim is nondischargeable "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss." 11 U.S.C. § 523(a)(7). Holder argues that the surcharges at issue (i) are not fines, penalties, or forfeitures, (ii) are not "payable to and for the benefit of a government unit," and (iii) do constitute compensation for actual pecuniary loss. The court disagrees on all three counts and affirms the Bankruptcy Court's determination that the surcharges owed to DPS are nondischargeable in this case.

(i) The surcharges are fines, penalties, or forfeitures.

Although section 101 of the Bankruptcy Code does not define the terms "fine, penalty, or forfeiture," surcharges imposed for convictions of traffic law violations have uniformly been found to be fines or penalties. *See, e.g., In re Curtin*, 206 B.R. 694 (Bankr. N.J. 1996); *In re Kent*, 190 B.R. 196 (Bankr. N.J. 1995); and *In re Kish*, 238 B.R. 271 (Bankr. N.J. 1999). The court is unpersuaded by Holder's argument that the surcharges cannot be fines and penalties without violating double jeopardy principles. Texas courts have recently rejected this same argument, holding that a license surcharge or reinstatement fee is not a criminal punishment in violation of double jeopardy principles. *See Drake*, 212 S.W.3d at 827; *Stautzenberger v. State*, No. 14-06-00451-CR, 2007 Tex. App. LEXIS 6224, at *13 (Tex. App.–Houston [14th Dist.] Aug. 7, 2007, no pet. h.). While a surcharge "obviously has a punitive effect . . . [it] does not constitute a disability or restraint and . . . a monetary penalty is not historically viewed as punishment,"*Drake*, 212 S.W.3d at 827 (citing *Hudson v. United States*, 522 U.S. 93, 104 (1997)), and double jeopardy does not bar the imposition of surcharges as fines in this context. As such, the court finds that the surcharges are "fines, penalties, or forfeitures" for the purposes of section 523(a)(7).

(ii) The surcharges are payable to and for the benefit of a government unit.

Section 101(27) of the Bankruptcy Code defines "governmental unit" to include a department or agency of the Unites States or a State. *See* 11 U.S.C. 101(27). The parties do not dispute the Bankruptcy Court's finding that DPS and the Comptroller are governmental units under section 523(a)(7). Thus, the critical inquiry is whether the surcharges are "payable to and for the benefit of" DPS, the Comptroller, or, more generally, the state of Texas.

As discussed above, the Comptroller distributes 49.5% of the surcharge monies to the state's general revenue fund and, under certain conditions, the Texas Mobility Fund. Holder does not dispute that monies paid to the state's general revenue fund benefit the state, but claims that the uncertainty of whether these monies will exceed $250 million, and thus be deposited in the

Texas Mobility Fund, means that this portion of the surcharges is not for the benefit of the state. This argument is without merit. Whether deposited in the general revenue fund or the Texas Mobility Fund, the surcharges are being paid to and benefitting the state. The benefits of the general revenue fund to the state are self-evident. In terms of the Texas Mobility Fund, the Bankruptcy Court aptly found that monies expended to construct and maintain public highways benefit the state and its citizens. The uncertainty of whether these monies will ever exceed $250 million at some point in the future is irrelevant to the inquiry at hand.

The other 49.5% of the surcharge monies, contributed to the Trauma Fund, are also "payable to and for the benefit of" the state. Payments made to the Trauma Fund benefit the state by furthering the state's interest in the sustainable, continuing healthcare of its citizens. The Trauma Fund is designed to reimburse trauma centers, or local governments that reimburse trauma centers, for the trauma cases that drivers such as Holder tend to cause. (Bk. Mem. Op. 7, R. vol. 10 Doc. 33). The funds are dispersed to eligible facilities based on a proportionate share of uncompensated trauma care provided in the state. (*Id.*). This disbursement permits these facilities to continue providing vital trauma healthcare for the citizens of Texas. Clearly, then, the state is receiving a direct monetary benefit from the surcharge monies in the Trauma Fund.

The only case cited by Holder in support of his challenge to the "payable to and for the benefit of" prong of the section 523(a)(7) analysis is *Legreide v. Pulley (In re Pulley)*, 303 B.R. 81 (D.N.J. 2003), which held that motor vehicle surcharges levied against the debtor by the New Jersey Division of Motor Vehicles ("DMV") were not payable to and for the benefit of a governmental unit because the surcharges were all remitted to a fund that underwrote entities designed to provide insurance to drivers who could not obtain coverage on the ordinary market. *Pulley*, however, is distinguishable. The New Jersey surcharge system allowed *all* the monies to be disbursed to private *creditors*. *Id.* at 89. In Texas, by contrast, 49.5% of the surcharges are remitted directly to the state with the other 49.5% going to trauma care centers. Moreover, the *Pulley* court noted that the state was merely "a contingent beneficiary of the DMV surcharges –

a status not sufficient on the [face] of § 523(a)(7) to justify that exception to discharge."*Id.* at 85. Under the Texas surcharge system, the state is not a "contingent beneficiary." It is a direct beneficiary not only of the general revenue funds but also of the funds for the trauma care facilities. Given the direct nexus between the state and the surcharges under the Texas scheme, the court finds that all of the surcharge monies satisfy the "payable to and for the benefit of" prong of the section 523(a)(7) analysis. Thus, with the exception of the 1% in administration fees, 99% of the surcharge monies are being paid to and for the benefit the state.

(iii) The surcharges do not compensate for pecuniary loss.

The purpose for the provision excluding "compensation for actual pecuniary loss" is to prevent governmental entities from attempting to convert "ordinary debt" into a nondischargeable claim. "Actual pecuniary loss," must, therefore, bear some causal relationship to "measurable damages from particular instances of wrongdoing." *Kish v. Farmer (In re Kish)*, 238 B.R. 271, 285 (Bankr. D.N.J. 1999). The court is unpersuaded by Holder's argument that the state suffered actual pecuniary loss because uncompensated trauma care is funded, in part, by the surcharge monies. (Holder's Br. 35-26, Doc. 6). The general harm caused by the congregate actions of drivers such as Holder is insufficient to satisfy the causal requirements of "actual pecuniary loss" standard. There is no evidence on the record that Holder's motor vehicle violations caused actual loss to the state or anyone else. *See Kish*, 238 B.R. at 285 ("The debtor's violations of the motor vehicle laws in this case did not cause any actual pecuniary loss to the DMV . . . or to anyone else for that matter.").

Therefore, the court finds that the Bankruptcy Court correctly concluded that Holder's surcharge fines were nondischargeable under 11 U.S.C. § 523(a)(7).

3. Whether Holder was entitled to injunctive relief on the reinstatement of his driver's license.

Holder argues that the Bankruptcy Court erred in denying his request to order DPS to reinstate his driver's license. Injunctive relief of this nature would have been inappropriate. The

suspension of Holder's license resulted from separate criminal proceedings and bore no relationship to his failure to pay the surcharge penalties.

IV. Conclusion

For all of the aforementioned reasons, it is hereby

**ORDERED** that the decision of the Bankruptcy Court for the Southern District of Texas in this matter is **AFFIRMED**.

**SIGNED** at Houston, Texas, this 28th day of September, 2007.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE